In the Matter of **MANUFACTURERS CREDIT CORPORATION et al.,**
Debtors, Appellants,

and

**Official Unsecured Creditors' Committee,**
**Intervenor,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Appellee.**

In the Matter of **MANUFACTURERS CREDIT CORPORATION et al.,**
Debtors.

**Sidney ENGELHARDT, Emanuel Engelhardt, and Isidor Engelhardt, and Kenron Co., a Partnership (Creditors), Appellants,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Appellee.**

**Joseph Thieberg, Receiver, Appellee.**

**Nos. 17088, 17112.**

United States Court of Appeals
Third Circuit.

Argued Feb. 23, 1968.

Decided May 16, 1968.

No. 17088:

Jay R. Benenson, Furst, Furst, Feldman & Benenson, Newark, N. J., for appellant Debtor Corporation.

Harold S. Okin, Okin, Pressler & Scherby, Ridgefield, N. J., for intervenor Official Unsecured Creditors Committee.

Charles Seligson, Seligson & Morris, New York City, for appellants.

Morris Ravin, Ravin & Ravin, Newark, N. J., for appellee-receiver.

Richard V. Bandler, Associate Regional Administrator, Securities and Exchange Commission, New York City, for appellee, Securities and Exchange Commission in both appeals.

Before KALODNER, FORMAN and FREEDMAN, Circuit Judges.

FORMAN, Circuit Judge.

This case involves the consolidation of two appeals from an order of the United States District Court for the District of New Jersey of January 12, 1968. In Appeal No. 17088, twenty-six debtor corporations and an official creditors committee question the propriety of that order which granted the motion of the Securities and Exchange Commission (hereinafter SEC) to dismiss arrangement proceedings under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., unless amended petitions are filed either by the debtors or their creditors complying with the reorganization provisions of Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 et seq. In Appeal No. 17112, appellants, Sidney, Emanuel and Isidor Engelhardt (hereinafter Engelhardt) and Kenron Co., challenge only that part of the District Court's order which relates to four of the corporations in which they claim substantial interests.

### I—APPEAL No. 17088

In 1932 Theodore J. Richmond formed a New Jersey corporation named Manufacturers Credit Corporation (hereinafter Manufacturers) to conduct a finance business. Sometime prior to 1948 it became a holding company and by 1967 a complex of twenty-six subsidiary or affiliated companies had been incorporated or acquired. Mr. Richmond was president of each company and controlled its affairs. The stock of each

was owned directly or indirectly by Mr. Richmond, his wife and two daughters. The companies have been classified as follows:

| Company | Business |
| --- | --- |
| 1. Inter-City Transportation Co., Inc. | Franchised Inter-State Bus Line |
| 2. Northeast Coast Lines | Franchised Inter-State Bus Line |
| 3. Orange & Black Bus Lines, Inc. | Franchised Inter-State Bus Line |
| 4. Warwick-Greenwood Lake & New York Transit, Inc. | Franchised Inter-State Bus Line |
| 5. Homestead Transit Co., Inc. | Franchised Intra-State Bus Line |
| 6. Inter-City Lines of New York, Inc. | Franchised Intra-State Bus Line |
| 7. Lake Region Coach Co., Inc. | Franchised Intra-State Bus Line |
| 8. Fairview Motor Repairs, Inc. | Franchised Intra-State Bus Line Bus Leasing |
| 9. New Jersey-New York Transit Co., Inc. | Bus Leasing |
| 10. Warwick Coaches, Inc. | Bus Leasing |
| 11. Washington Corp. | Bus Leasing and Financing |
| 12. Clifton Terminal Corp. | Real Estate |
| 13. Donal, Inc. | Real Estate |
| 14. Fairtrans Realty Corp. | Real Estate |
| 15. Jaytee Securities Corp. | Real Estate |
| 16. Monroe Securities Corp. | Real Estate and Financing |
| 17. Orblack Securities Corp. | Holding Company |
| 18. Waldwick Realty Company, Inc. | Holding Company |
| 19. Manufacturers Credit Corporation | Financing and Holding Company |
| 20. Intercity Securities Corporation | Financing |
| 21. Inter-State Securities Corporation | Financing |
| 22. Mondrich Securities Corp. | Financing |
| 23. Tee Jay Ar Securities Corp. | Financing |
| 24. Te Jay Commercial Corp. | Financing |
| 25. Transit Securities Corporation | Financing |
| 26. Inter-City Tours, Inc. | Transportation Broker |

———◆———

Nine corporations, including Manufacturers, are engaged in the financing business. Seven are engaged in the operation of bus lines. One company is a transportation broker and another owns real estate in New Jersey not used in connection with the bus operations. Except for Orange & Black Bus Lines, Inc.,

none of these companies owns the buses used in its service. The buses and other equipment are leased to the operating companies by four of the affiliated companies. Similarly, the operating companies do not own the garages, parking lots or terminals which they use. These facilities are leased from four other affiliated companies which are engaged in the real estate business.

In 1948 Manufacturers began the sale to the public of its unsecured corporate promissory notes bearing interest at rates ranging from 9 percent to 15 percent and maturing generally in three years. By 1954, the principal debt outstanding from these notes approximated $400,000. Since then, the amount borrowed by Manufacturers has increased to more than $48,000,000 owed to about 4,000 public investors. Eight of Manufacturers affiliated or subsidiary corporations engaged in similar borrowing operations and now owe more than 900 lenders almost $10,000,000. It is alleged that no registration statement, required by the Securities Act of 1933, 15 U.S.C. § 77a et seq., was filed during the twenty years of public financing, although it does not appear that any exemption from registration was available. It is further alleged that many persons acted as "finders" on a regular basis and were paid bonuses or commissions for their services in bringing in new investors and that they now hold notes in upwards of $2,000,000.

In reality, Mr. Richmond employed these financing corporations as instrumentalities whereby he borrowed ever increasing huge amounts of money from the public. His scheme was to have the corporations turn over to him the proceeds from the sale of the unsecured promissory notes whereupon he paid the interest charges and other expenses. The corporations were represented as the borrowers to preclude the defense of usury. As interest accrued and principal amounts matured new notes were sold and their proceeds used to meet the earlier obligations. The result of this method of financing was an increasingly complicated debt structure with thousands of notes outstanding issued by various debtors, bearing different interest rates and maturing at different dates.[1] The payments required by the terms of these notes in 1966 amounted to approximately $6,000,000 for interest and an equal amount for principal. As against this debt servicing charge of $12,000,000, the 1966 combined profits of all of the companies was approximately $300,000.

The crisis which followed precipitated the filing of a joint petition under Chapter XI of the Bankruptcy Act by Manufacturers and nineteen of its subsidiary or affiliated corporations on August 1, 1967. Pursuant to a petition by Mr. Richmond as president of six additional corporations, an order was entered on August 3, 1967 extending the original Chapter XI proceedings over them. A receiver was appointed who has supervised the operations of all of the debtors.[2] An official creditors committee was formed and it has actively participated in the proceedings.

On August 28, 1967 each of the debtors filed schedules and statement of affairs. In the aggregate, assets totalled $136,217,309, including $109,443,183 of inter-company receivables, and liabilities amounted to $120,660,618, including inter-company debts or sums owed to Mr. Richmond of $54,716,433. Actual tangible assets listed in the schedules totalled $10,000,000 not including the value of the franchises, while liabilities, exclusive of debts owed to Mr. Richmond

1. Besides, the monies borrowed from the public, substantial amounts were borrowed from banks and other sources. Indeed, $10,000,000 of tangible assets are subject to the security interests of non-public creditors. At least one of the banks asserts that its loans were made on the basis of a financial statement issued by Mr. Richmond which understated the liabilities of Manufacturers by $40,000,000.

2. A receiver has also been appointed for Mr. Richmond in his separate Chapter XI proceedings.

and affiliated companies, amounted to $65,950,361.

On October 27, 1967, after lengthy negotiations with the official creditors committee, the debtors proposed a plan of arrangement. The "essential thrust" of the plan, as asserted by the debtors, is that the stockholders of the debtor corporations would convey all of their stock to the receiver and 1,000,000 new shares of capital stock of Manufacturers would be issued, 90 percent of which is to be designated as Class "A" and 10 percent as Class "B". The Class "A" stock is to be held in trust or distributed on a pro-rata basis for the benefit of the unsecured creditors. Soli Fuhrman, Mr. Richmond's son-in-law, would receive all of the Class "B" stock. A new nine-man board of directors would be chosen, seven selected by the Class "A" stockholders and two by the Class "B" stockholder. Mr. Fuhrman would be employed as general manager, a position he had held for nineteen years. The Class "A" stock would be preferred over the Class "B" stock as to dividends and liquidation. The Debtors state that the main concept of the plan would be to effectively convey complete control, ownership and management of the entire business to the creditors.

The proposed plan also called for the issuance of new promissory notes to general unsecured creditors in full settlement of their claims. The claims of the creditors were to be scaled down according to a formula in which it was recognized that as investors loaned money to Mr. Richmond, he used the funds to pay interest on prior loans. On the assumption that the average rate of interest was 12 percent, under the formula 7 percent was to be considered a return on principal and 5 percent as interest. Creditors' claims were to be reduced in direct proportion to the number of years in which they received the 7 percent return of principal, with a maximum decrease of 42 percent for loans outstanding for six years or longer. The plan also proposed the establishment of a sinking fund to be derived from the profits of the corporations for the purpose of retiring the notes to be issued.

On October 18, 1967 the SEC filed a motion to intervene for the purpose of moving, pursuant to section 328 of the Bankruptcy Act,[3] to dismiss the Chapter XI proceedings unless the debtors' petition be amended, or a creditors' petition be filed complying with the requirements of Chapter X. The District Court ordered the debtors to show cause on November 3, 1967 why the motion should not be granted. A hearing was held on that date at which the opposition of the debtors and the creditors committee was advanced. A suggestion was made at this time by the debtors that the plan of arrangement would be amended so that only one class of stock would be issued thereby eliminating any interest previously provided for Mr. Fuhrman. On November 14, 1967, an order was entered granting the intervention and reserving decision on the motion for dismissal of the Chapter XI proceedings.[4]

3. 11 U.S.C. § 728.
   "The judge may, upon application of the Securities and Exchange Commission or any party in interest, and upon such notice to the debtor, to the Securities and Exchange Commission, and to such other persons as the judge may direct, if he finds that the proceedings should have been brought under chapter 10 of this title, enter an order dismissing the proceedings under this chapter, unless, within such time as the judge shall fix, the petition be amended to comply with the requirement of chapter 10 of this title for the filing of a debtor's petition or a creditors' petition under such chapter, be filed. Upon the filing of such amended petition, or of such creditors' petition, and the payment of such additional fees as may be required to comply with section 532 of this title, such amended petition or creditors' petition shall thereafter, for all purposes of chapter 10 of this title, be deemed to have been originally filed under such chapter."

4. At the close of the November 3 hearing, the District Judge stated that he would reserve judgment until he received the report of the accountants who had been appointed by the receiver to investigate the financial affairs of the debtors.

The District Court, on January 12, 1968, granted the motion of the SEC to dismiss the Chapter XI petitions or in the alternative to transfer them to Chapter X if the petitions were amended accordingly. The debtors appeal from that order and, by order of this court, the Official Unsecured Creditors' Committee was permitted to intervene as an appellant.

In SEC v. American Trailer Rentals Co.,[5] the Supreme Court dealt with the choice between Chapter X and Chapter XI as the appropriate procedure for conducting a particular corporate rehabilitation. The Court expressly reaffirmed its prior holdings [6] which rejected the application of an absolute rule for making the choice. Within the established principles, the factual determination as to which proceeding is required by the needs of a particular debtor has been left to the sound discretion of the District Court. The issue then before this court is whether the District Court, relying on these principles, abused its discretion in determining that the remedies of Chapter X were more appropriate for the debtors than the remedies provided by Chapter XI.[7]

The Supreme Court in General Stores Corp. v. Shlensky [8] emphasized that the choice between Chapter X and Chapter XI is not controlled by the size and character of the debtor nor by the nature of its capital structure. While the Court reiterated the premise of its earlier case, SEC v. United States Realty & Improvement Co.,[9] stating that "in most cases where the debtor's securities are publicly held c. X will afford the more appropriate remedy," it concluded that the choice between the two chapters depends upon the "needs to be served." [10] Some of the needs discussed in *General Stores* were: the requirement of fairness to public debt holders, an accounting by the management for misdeeds, a determination whether new management is required, and substantial readjustment of a complicated debt structure. The choice between the two chapters, then, depends upon whether the formulation of a plan under Chapter XI by the debtor, or the formulation of a plan by a disinterested trustee and the other protections afforded by Chapter X "would better serve 'the public and private interests concerned including those of the debtor.' "[11]

In SEC v. Canandaigua Enterprises Corp.,[12] the Court of Appeals for the Second Circuit was faced with the same choice of rehabilitative remedies for corporate debtors. Recognizing that the Supreme Court in *General Stores* had foreclosed the avenue of adopting an absolute rule for making this choice, the Court of Appeals nevertheless felt compelled to set forth an express standard with the hope that the District Courts within its circuit could then uniformly approach the issue. Referring to the *General Stores* case, the court stated:

"But we do not read that decision as precluding a court of appeals from rul-

---

After waiting several weeks the District Judge was advised by counsel for the receiver that the report would not be forthcoming for an additional three weeks and that the report would be of a "preliminary" nature. At the urging of the SEC, the District Judge apparently determined that the additional period of waiting, thereby continuing the debtors in a posture of uncertainty, was no longer warranted. The charge that the District Judge acted erroneously in deciding the legal issues without awaiting the accountants' "preliminary report" lacks merit.

5. 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965).

6. General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1956); SEC v. United States Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).

7. SEC v. American Trailer Rentals Co., 379 U.S. 594, 619, 85 S.Ct. 513 (1965).

8. 350 U.S. 462, 76 S.Ct. 516 (1956).

9. 310 U.S. 434, 60 S.Ct. 1044 (1940).

10. 350 U.S. at 466, 76 S.Ct. 516, 519.

11. Id. at 465, 76 S.Ct. at 519.

12. 339 F.2d 14 (2 Cir. 1964).

ing that the need for a readjudgment of publicly held debt creates a presumption in favor of Chapter X, whereas a case calling only for modification of the claims of trade creditors or others who have had private dealings with the debtor is presumptively to be handled under Chapter XI." (339 F.2d at 19)

In *American Trailer Rentals* the Supreme Court cited *Canandaigua* with approval and although it did not adopt the presumptions stated therein, it reaffirmed its conclusion in *United States Realty* that "as a general rule Chapter X is the appropriate proceeding for adjustment of publicly held debt." [13] The Supreme Court then explained the rationale for this general rule:

"Public investors are, as here, generally widely scattered and are far less likely than trade creditors to be aware of the financial condition and cause of the collapse of the debtor. They are less commonly organized in groups or committees capable of protecting their interests. They do not have the same interest as do trade creditors in continuing the business relations with the debtor. Where debt is publicly held, the SEC is likely, as here, to have become familiar with the debtor's finances, indicating the desirability of its performing its full Chapter X functions. It seems clear that in enacting Chapter X Congress had the protection of public investors, and not trade creditors, primarily in mind. As noted above, Chapter X is one of many Acts in which the SEC has the statutory right and responsibility to protect public investors." (379 U.S. at 613–614, 85 S.Ct. at 524)

Having set forth the general rule, the Court proceeded to discuss the narrow limits within which there are exceptions. It suggested that even where the publicly held debt is directly affected, the simple composition of Chapter XI may be proper where the public investors are few in number and familiar with the debtor operations, or where a greater number of public investors exist but the adjustment of their debt is relatively minor, such as a short extension of time for payment.

■ It is obvious in the instant case that the public investors are not few in number and that they are probably totally unfamiliar with the debtors' operations. Approximately 5,000 public investor-creditors hold unsecured notes of the debtors and it is apparent that the payment of the huge debt owed to these persons cannot be effectuated by a relatively minor adjustment such as the short extension of time for payment suggested in *American Trailer Rentals*. In fact, the very Chapter XI plan proposed by the debtors acknowledges the need for a radical readjustment of the debt structure. In this regard, the District Judge was without fault in declaring in his opinion that under these circumstances "procedure under Chapter X is prima facie required."

Appellants cite several cases where the courts have approved the rehabilitative process of Chapter XI despite the SEC's attempt to require compliance with Chapter X. Reliance on them was misplaced for they are readily distinguishable from the instant case. In the first of these cases, In re Lea Fabrics, Inc.,[14] the debtor's capital structure was relatively simple, the public investors owned only common stock and the court noted that the proposed arrangement did not interfere in any way with the rights of the shareholders. Again, in Grayson-Robinson Stores, Inc. v. SEC,[15] the court noted that no publicly held securities would be readjusted under the plan of arrangement. In re Transvision, Inc.,[16] also presented a situation where, although there was publicly held common

---

13. 379 U.S. at 613, 85 S.Ct. at 524.

14. 272 F.2d 769 (3 Cir. 1959), vacated as moot, 363 U.S. 417, 80 S.Ct. 1258, 4 L. Ed.2d 1515 (1960).

15. 320 F.2d 940 (2 Cir. 1963).

16. 217 F.2d 243 (2 Cir. 1954), cert. denied, 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744. (1955).

stock only the claims of trade creditors were adjusted while the interests of stockholders remained unaffected.

■ These cases, on the contrary, lend support to the position taken by the SEC herein, because in each instance where the court deemed the elaborate procedures of Chapter X inadvisable, it was careful to mention that nothing more than mere suspicions of improper dealing on behalf of management had been raised. In this connection, it is to be noted that in *United States Realty, General Stores, and American Trailer Rentals,* the Supreme Court emphasized the propriety of Chapter X in circumstances warranting an independent investigation of management's misdeeds by a disinterested trustee.

But here, the creditors committee denies the necessity for a Chapter X trustee's independent investigation. It admits the necessity for an investigation of management but asserts that it can be as effectively conducted in Chapter XI under section 21(a) of the Bankruptcy Act[17] through its vigorous efforts, as by any investigation conducted under Chapter X. This view is not found persuasive.[18] Despite numerous and lengthy section 21(a) examinations no satisfactory explanation has disclosed the disposition of the $58,000,000 taken from the public investors. At most Mr. Richmond testified under such examinations that about half of the money was used for development purposes and that the other half was used to meet the note obligations as they became due. Yet no development program justifying the expenditure of such funds was shown.

The financial records of the debtors are themselves signals that intensive investigation is urgently required. The debtors did not retain independent accountants to conduct periodic audits. Rather, Mr. Richmond personally maintained the books of Manufacturers. The bookkeeper who supervised and maintained the books of the other debtors asserted his rights under the Fifth Amendment when questioned by the receiver's counsel during a section 21(a) examination. These factors raise more than the mere suspicion of management wrongdoing which existed in *Lea Fabrics,* and *Transvision.* It appears that here, only a massive and penetrating investigation, available through the offices of Chapter X may satisfactorily disclose the real objectives of the manipulations practiced by the debtors' management.[19] Thus the conclusion is commanded that a Chapter X trustee's independent investigation will make available to the public investor creditors a fuller and more effective disclosure regarding the dissipation of their money than may be expected by examination under section 21(a) in Chapter XI.

■ As authority for the proposition that the SEC may as effectively intervene and conduct an independent investigation of the debtors' affairs in a Chapter XI proceeding as in Chapter X, the debtors and the creditors committee point to *American Trailer Rentals.* It is true that the Supreme Court in that case said: "[W]hile not charged with express statutory rights and responsibilities as in Chapter X, the SEC is entitled to intervene and be heard in a Chapter XI proceeding."[20] However,

17. 11 U.S.C. § 44(a).

18. See Grayson-Robinson Stores, Inc. v. SEC, 320 F.2d 940, 949 (2 Cir. 1963).

19. There are other factors which, at this point, warrant only brief mention. For example, there is the question whether the monies repaid to various noteholders and other creditors in the four months immediately preceding the filing of the petition constitute voidable preferences which may be recovered by the estate.

Also, a substantial question of fraud exists regarding the issuance of an allegedly materially false financial statement of Manufacturers to obtain credit from banks and other sources. As to whether this charge, if proved, alone would bar confirmation by the court of any Chapter XI plan of arrangement (11 U.S.C. § 766(3)), of course, does not now require consideration.

20. 379 U.S. at 613, 85 S.Ct. at 523.

the Court makes it plain that the right to "intervene and be heard" should not be equated with the SEC's full power to investigate and report under Chapter X, for closely following the above quotation, it said: "Where debt is publicly held, the SEC is likely, as here, to have become familiar with the debtor's finances, indicating the desirability of its performing its *full Chapter X functions*." [21] In this case, although it is alleged that the registration requirements of the Securities Act were unfulfilled, it still appears appropriate that the SEC bring to bear its expertise and perform "its full Chapter X functions" in protecting the interests of the investing public. As the Court declared in *United States Realty:*

> "The basic assumption of Chapter X and other acts administered by the Commission is that the investing public dissociated from control or active participation in the management, needs impartial and expert administrative assistance in the ascertainment of facts, in the detection of fraud, and in the understanding of complex financial problems." (310 U.S. at 448–449, 60 S.Ct. at 1050 n. 6)

Additional safeguards are provided by Chapter X: The trustee is required to transmit a report of his study and investigation to all creditors, stockholders and interested parties. The reorganization plan must be approved by the court and, in a case such as this where liabilities exceed $3,000,000, the plan must be submitted to the SEC for its expert examination and advisory report. Having been approved the plan is then submitted to the parties in interest accompanied by the judge's opinion and the SEC's report. Chapter X, therefore, provides a basis upon which the widely scattered and often uninformed public investors may make an intelligent and knowing judgment as to the fairness and feasibility of a comprehensive reorganization plan. These protective devices of Chapter X are in contrast to the provisions of Chapter XI where acceptance of the plan of arrangement by the creditors may be solicited either before or after the filing of the petition and always before the court's approval of the plan. Such safeguards are peculiarly applicable to the needs of the investor creditors herein.

Then, too, deserving of marked consideration is the SEC's contention that several features of the proposed plan call for the comprehensive treatment afforded by Chapter X. Briefly, some of them are:

The formula to scale down the notes of the public investor creditors by 7 percent for each year held, may be arbitrary since it fails to take into account that many investor creditors received as little as 9 percent interest while others received as much as 15 percent.

The method of retiring the scaled down notes may be highly illusory since the reduced obligations would still constitute a debt of $30,000,000 while the envisioned sinking fund to be derived from the profits of the operating companies would, at their present rate, provide, as most, $300,000 each year.

Disregarded are potential remedies which the Securities Act of 1933 may afford innocent investors against those from whom they purchased the notes, including those "finders" who acted as underwriters as that term is defined by the Act. Furthermore, the plan would treat notes held by "finders" on an equal basis with those held by the other investors. Actions for remedies indicated by the foregoing and for others, which may be disclosed by his investigation, can be more effectively prosecuted by a Chapter X trustee than by the individuals concerned.

The appellants contend, contrary to the assertions of the SEC, that Chapter X offers the investor creditors no advantage since the main thrust of the proposed plan would vest in them full control, management and ownership of the

---

21. Id. at 614, 85 S.Ct. at 524. (Emphasis supplied.).

debtor corporations thereby giving the investor creditors everything they could hope to achieve.[22] The surrender of the entire stockholder interest may be a unique feature in the proposed plan but, considered in light of all the facts present in this case, it does not necessarily follow that such an arrangement is the ultimate in creditor relief nor is it sufficient reason to sanction the summary rehabilitative process of Chapter XI without the full safeguards of Chapter X.

■ It is quite apparent that here the protective provisions of Chapter X will better serve "the public and private interests concerned including those of the debtor." Each "need" which the Supreme Court has considered in calling for Chapter X proceedings is present in this case. Here public debts are to be substantially readjusted and the numerous investors are widespread, rather than few in number and intimately connected with the debtor; there is evidence of management improprieties calling for a thorough investigation; new management is obviously required; and a complete corporate reorganization is essential. All of these facts are admitted by the appellants, particularly the last two which are themselves embodied in the suggested plan of arrangement.

Again, we advert to the teaching of the Supreme Court in *American Trailer Rentals* wherein it stated that a district court does not possess open-ended discretion to decide on a case-by-case basis "whether in its opinion it would be better for a particular debtor to be in Chapter X or Chapter XI."[23] That decision, it declared, may only be made with reliance upon the principles which have been discussed above. The District Court in this case adhered to this admonition. Having found that all the "needs" existed here, it properly concluded that Congress had prescribed the remedies of Chapter X rather than those of Chapter XI for debtors situated such as these appellants and, in these circumstances, it could not sanction Chapter XI proceedings.[24] Hence, the District Court acted well within its discretion in granting the SEC's section 328 motion to dismiss the Chapter XI proceedings unless petitions complying with the requirements of Chapter X are filed.

## II—Appeal No. 17112

■ Engelhardt and Kenron Co. appeal from so much of the District Court's order of January 12, 1968 as relates to Orblack Securities Corp. (Orblack), Orange & Black Bus Lines, Inc. (Orange & Black), Fairview Motor Repairs, Inc. (Fairview) and Fairtrans Realty Corp. (Fairtrans).[25] The appellants object principally to any consolidating, merging or pooling of the assets of the four corporations in which they have an interest

---

22. This contention is based on the fact that at the November 3, 1967 hearing, Mr. Fuhrman volunteered to surrender the ownership and management interests which had been reserved for him under the original plan of arrangement.

23. SEC v. American Trailer Rentals Co., 379 U.S. 594, 619, 85 S.Ct. 513, 527 (1965).

24. The final argument of the debtors and creditors committee concerns the need for speed and the avoidance of expenses which Chapter XI is said to afford. The Supreme Court in *American Trailer Rentals* expressed the reason for rejecting this argument when it said:
    "[E]xperience in this area has confirmed the view of Congress that the thoroughness and disinterestedness assured by Chapter X not only result in

greater protection for the investing public, but often in greater ultimate savings for all interests, public and private, than do the so-called 'speed and economy' of Chapter XI. * * * Moreover, the requirements of Chapter X are themselves sufficiently flexible so that the District Court can act to keep expenses within proper bounds and insure expedition in the proceedings." (379 U.S. at 617–618, 85 S.Ct. at 526)

25. Fairview and Fairtrans were among the twenty corporations named in Manufacturers' Chapter XI petition of August 1, 1967, which, by the Referee's ex parte order of August 3, 1967, was extended to include six corporations, among them Orblack and Orange & Black.

with those of the twenty-two other corporations.[26]

The relationship between Engelhardt and Orblack arose on September 30, 1964 from the sale by Engelhardt of the outstanding capital stock of Orange & Black and Fairview to Orblack in consideration of purchase prices of $860,000 and $120,000 respectively, on account of which down payments of $50,000 and $10,000 were made. The balances were payable in equal monthly installments over a fifteen year period and secured by purchase money pledges and liens on the capital stock of Orange & Black and Fairview. As of October 11, 1967, Orblack remained indebted to Engelhardt on account of the price of the Orange & Black stock in the amount of $700,439.12, and on account of the price of the Fairview stock in the amount of $95,121.11. Also on September 30, 1964, Kenron sold to Fairtrans certain real estate in consideration of a purchase price of $1,140,000, on account of which a down payment of $740,000 was made. The balance of $400,000 was likewise payable in equal monthly installments over a fifteen year period and secured by a purchase money mortgage covering the real property and the improvements thereon. As of October 11, 1967, Fairtrans remained indebted to Kenron, on account of the purchase price, in the sum of $345,895.93.

Engelhardt and Kenron (appellants) assert: Orblack is a holding company[27] and has no creditors except Engelhardt. Orange & Black owns buses and operates bus lines under interstate and intrastate franchises. Fairview leases buses and other equipment to Orange & Black for use in its operations. Fairtrans, as a result of the sale to it by Kenron, owns the real property on which are constructed the garage and other facilities

used by Orange & Black and Fairview. None of the four corporations sold unsecured notes or borrowed money from the public. They have no public debt, their capital structure is not complex, and they have no publicly held securities.

Although appellants did not contest the SEC's section 328 motion in so far as it urged dismissal of the Chapter XI petitions against the corporations, including Orblack, Orange & Black, Fairview and Fairtrans, they opposed conditioning such dismissal upon the opportunity for the filing of Chapter X petitions against the four corporations. In the alternative they requested that if the District Court should grant the motion of the SEC any Chapter X petitions which are filed should be separate from and limited to the affairs and property of each corporation.

The grounds for their opposition to the SEC motion included: (1) the application of SEC contemplated a consolidation of the assets and liabilities of the twenty-six corporations thereby destroying the corporate integrity of each of the distinct entities and the rights of Engelhardt and Kenron in reliance thereon; (2) the consolidation of the assets and liabilities would constitute a taking of property and deprivation of the rights relied upon by Engelhardt and Kenron without due process of law; (3) the four corporations are solvent, profitable and have no public debt, and their assets should not bear the expense of Chapter X proceedings to the prejudice of Engelhardt, Kenron and their other creditors; (4) a Chapter X reorganization petition cannot be filed in "good faith" by or against Orblack, Orange & Black, Fairview and Fairtrans, because Engelhardt is the only creditor of Orblack, and the other three corporations

26. Prior to the filing of the SEC's section 328 motion, Engelhardt and Kenron applied to the Referee for an order severing the respective debtor proceedings and dismissing the Chapter XI proceedings as to the four corporations. No decision has been rendered by the Referee on this application because the District

Court stayed all proceedings pending its decision on the SEC's motion, except that the four corporations were ordered to file separate amended Chapter XI petitions and they were filed on October 9, 1967.

27. The capital stock of Orblack is owned 55 percent by Mr. Richmond and the balance by his wife and two daughters.

are solvent and pay their respective debts as they mature.

The District Court rejected the arguments of Engelhardt and Kenron and granted the SEC's motion. Its order of January 12, 1968 reads in part:

"Ordered that the petitions of the debtors for relief under Chapter XI of the Bankruptcy Act and the Chapter XI proceedings herein, be and the same hereby are dismissed unless within 10 days from the date of this order the debtors file amended petitions to comply with the requirements of Chapter X of the Bankruptcy Act for the filing of a debtor's petition or within such time creditors' petitions under Chapter X be filed."

The SEC moved to dismiss the appeal taken by Engelhardt and Kenron from the above order principally on the ground that they were not aggrieved by the District Court's order. It contends that the appellants have obtained the alternative relief they sought since the order is clearly couched in the plural— employing the word "petitions." Thus, only separate Chapter X petitions may be filed as to the four corporations. The SEC insists that the appellants are in the precise position in which they would have been had no Chapter XI petitions been filed, with the single qualification that if timely Chapter X petitions are filed for these corporations, in effect, they would be pre-dated to the time of the filing of Chapter XI petitions.

The appellants, on the other hand, maintain that they are aggrieved by the District Court's action because it rejected their argument that Chapter X is unavailable and inappropriate for the four corporations and by treating all twenty-six corporations alike it required the four corporations to submit to the expensive and elaborate rehabilitation process of Chapter X. Specifically, appellants argue:

"Without any evidentiary hearings or basis therefor, the District Court concluded that all of the debtor corporations were, in effect, a single unit and as a consequence ' * * * a chapter X Reorganization Court may consolidate the administration and the assets and the liabilities of the separate corporations.' "

Noting that the District Court, in its opinion, declared "all the debtors require rehabilitation," appellants conclude that the District Court has effected a consolidation of the corporations. They explain that on a consolidated basis the twenty-six corporations would be overwhelmingly insolvent since their total liabilities far exceed their total assets. If so consolidated, the distinct corporate identity of these four profitable corporations, on which appellants relied, will be disregarded, and the respective assets in which they have substantial security interests, will be dispersed to their irreparable damage.

In addition the appellants reiterate the arguments made to the District Court that the four corporations are not properly the subjects of "good faith" Chapter X petitions because they are solvent and profitable, paid their respective debts as they matured, and had uncomplicated debt and capital structures with no publicly held securities.

To demonstrate they are aggrieved by the District Court's order and that their appeal is not premature, appellants attempt to establish that the District Court already has determined that the entire complex of corporations should be treated as a single economic unit. This they do by pointing to portions of the opinion of the District Court, such as: "Where, as here, several debtor corporations are * * * operated as a single unit"; "a Chapter X reorganization court may consolidate the administration and the assets and liabilities of the separate corporations";[28] and "all the debtors require

28. The pertinent part of the District Court's opinion, reported at 278 F.Supp. 383, 391 (D.N.J.1968), is:
"Where, as here, several debtor corporations are all owned or controlled by one person, and operated as a single unit, with little or no attention paid to the formalities usually observed in independent corporations, and the officers and directors of all of the

rehabilitation." But these statements do not justify the conclusion drawn by the appellants, that the District Court has determined that the administration, assets and liabilities of the four corporations should be consolidated with the other twenty-two. At most, the District Court, in its opinion, recited conditions under which it "may" effect a consolidation of corporations under Chapter X.

The situation that confronted the District Court revealed the basic firm fact that the four corporations involved in this appeal were owned and controlled by Mr. Richmond, who similarly dominated the other twenty-two corporations. Also disclosed were the layers of widely scattered public holders of unsecured notes, the bizarre pattern of borrowings and withdrawals by Mr. Richmond from and to multiple corporate accounts and the confused and uninformative bookkeeping records. Because of the complexity of the facts before it, the District Court took an overall view of the situation. Its findings were, therefore, generalizations without detailed references to the implications attached to each individual corporation. In this posture the District Court concluded that the proceedings as to these corporations should have been brought under Chapter X.

In so treating this corporate complex, the District Court specifically sought to prevent any prejudice to the rights of Engelhardt and Kenron. After making several observations as to the general status of the twenty-six corporations, the District Court declared that in

corporations are substantially the same, and funds were shifted back and forth between the corporations in an extremely complex pattern and, in effect pooled together with loans being made back and forth, borrowings made by some to pay obligations of others, and withdrawals made from and to corporate accounts by the individual in control of all were not sufficiently recorded on the books of the respective corporate entities, auditing of the financial conditions of the corporations and investigation of the inter-company relationships would entail great ex-

Chapter X a reorganization court, under given circumstances, has the power to consolidate the administration and the assets and liabilities of separate corporations. But this statement, read in its context, must be taken to mean that if the Chapter X court deemed consolidation of the separate corporations to be necessary for their rehabilitation as an interrelated whole it had such power. Any immediate exercise of that power as far as the four corporations were concerned was negatived by the language of the District Court promptly qualifying its intention when it stated: "If Orblack, Orange & Black, Fairview and Fairtrans are not insolvent they may plead by answer under § 137 of the [Bankruptcy] Act (11 U.S.C. 537) seeking a dismissal under 144 of the Act (11 U.S.C. 544)."

This language clearly indicates that the District Court specifically sought to preserve the appellants' rights. It recognized that the appellants would suffer no prejudice by the mere filing of Chapter X petitions since they, as creditors, could file answers seeking dismissal of the petitions and have the issues resolved as soon as may be as authorized by sections 137 and 144.

This procedure does no more than postpone the evidentiary hearing to which appellants would be entitled and does not deprive them of their due process as they charge. The fear that the four corporations will be saddled with inordinate administrative expenses, hazardous to the appellants' interests, is also unwarranted, at least until Chapter X petitions against them are approved.

penditure of time and expense without assurance that a fair reflection of the conditions of the debtor corporations would in the end be possible. Accordingly a Chapter X reorganization court may consolidate the administration and the assets and liabilities of the separate corporations. Chemical Bank New York Trust Company, Trustee v. Kheel, 369 F.2d 845 (2 Cir. 1966). If Orblack, Orange & Black, Fairview and Fairtrans are not insolvent they may plead by answer under § 137 of the Act (11 U.S.C. § 537) seeking a dismissal under 144 of the Act (11 U.S.C. § 544)."

Moreover, the language in the order of the District Court bolsters the conclusion that no consolidation of the affairs of the corporations has been accomplished. By use of the word "petitions," the order makes clear that separate petitions are called for, thereby enabling the appellants to answer and move for dismissal in proceedings separate and apart from those involving the other twenty-two corporations. The order, therefore, grants the alternative relief sought by the appellants while still preserving for them the opportunity to secure their primary relief, that is, rejection of Chapter X as appropriate for the four corporations. Thus, it is apparent that neither in its opinion nor in its order did the District Court direct consolidation of all twenty-six corporations either administratively or by way of merging or pooling the four corporations' assets and liabilities with those of the other twenty-two.

Appellants contend, in this connection, that the failure of the District Court to grant the primary relief they claimed gave them the right to appeal notwithstanding the granting of alternative relief. They cite Aetna Casualty & Surety Co. v. Cunningham,[29] for the proposition that a party has the right to be heard on appeal when it has been denied either the quality or quantity of relief primarily sought. In Aetna, the surety company sued on two separate claims of the right to recover the same amount; first, fraud to induce the execution of a surety bond, and second, breach of an indemnification contract. The defendant conceded liability on the second ground and the District Court granted judgment based thereon, finding that the fraud claim was unsupported. The Court of Appeals justified the surety company's right of appeal when only the alternative relief was granted, because by denying the primary relief the trial court prejudiced the appellant by foreclosing potential rights to bar a defense of bankruptcy discharge. The instant case is clearly distinguishable because appellants will suffer no prejudice by the District Court's order which preserves their right to seek dismissal of Chapter X petitions if they are filed against the four corporations.

Appellants emphasize the fact that there was before the District Court the affidavit of Sidney Engelhardt attesting the solvency and the prosperity of the four corporations and that these averments stand unchallenged. This, they stress, is a strong factor in compelling a rejection of the SEC's section 328 motion in so far as the inclusion of the four corporations in Chapter X proceedings is concerned. Although, at first, this contention seems impressive, it must be noted that in this very affidavit the alternative relief of separate petitions for each of the four corporations was requested. In light of the determination to grant appellants that alternative relief and to preserve the right to their primary relief, the issue of solvency became premature at least until Chapter X petitions are filed and answered. That the District Court declined to credit the averments of solvency with the force the appellants sought, was, therefore, not an abuse of its discretion.

In another argument urged by the appellants, they assert that when SEC moves under section 328 it has the burden of establishing that Chapter XI is inappropriate for the corporate debtors and that their needs would best be served by proceedings under Chapter X. Appellants complain that in granting the SEC's motion in this case the District Court unjustly and inequitably shifted to appellants the burden of establishing that Chapter X is inappropriate for the four corporations. Such a conclusion does not follow. If Chapter X petitions are filed, the then petitioners, and not Engelhardt and Kenron, will have the burden of proving that their petitions comply with the requirements of Chapter X and that they have been filed in good faith.[30]

29. 244 F.2d 478, 69 A.L.R.2d 696 (5 Cir. 1955).

30. Corr v. Flora Sun Corp., 317 F.2d 708 (5 Cir. 1963); In re St. Charles Hotel

For the reasons set forth in Part I hereof (Appeal No. 17,088), the order of the District Court of January 12, 1968 will be affirmed.

As demonstrated in Part II hereof (Appeal No. 17,112), Engelhardt and Kenron have not been aggrieved by the order of the District Court of January 12, 1968 and their appeal herein is premature. Hence the Motion of the SEC to dismiss it will be granted, of course, without prejudice to any future appeal.

Co., 60 F.Supp. 322 (D.N.J.), aff'd, 149 F.2d 645 (3 Cir.), cert. denied sub nom., Ladin v. Hurwith, 326 U.S. 738, 66 S.Ct.

48, 90 L.Ed. 440 (1945); In re Peterson's Motor Exp., Inc., 84 F.Supp. 230 (D.N.H.1949).